## *In re* CHARLES A. SWENSON'S ESTATE.

Argued Nov. 13, 1893.   Reversed Nov. 27, 1893.

No. 8333.

**A will may speak as of the day of its execution.**

The rule that a will speaks as of the day it takes effect as to the persons who are to take under it, is not an unyielding one, nor is there an inflexible rule for determining the meaning of the words "heirs at law" when found in such an instrument.

**The facts stated; "Heirs at law" construed to mean "next of kin."**

A will was made in the year 1884, by a married man. He had no children, and his wife and himself were so advanced in age that it could not be expected that children would thereafter be born, and none were born, to them. By the terms of this will he devised to his wife a life estate in all of his real property, and also gave to her a share of his personal estate. Subject to said life estate, he devised certain tracts of land to other persons, naming them. Then followed the following paragraphs: "Sixth. I give and bequeath all the rest of my personal property of every kind whatsoever, including notes, bonds, mortgages, and contracts, to my heirs at law, share and share alike. Seventh. I will, at the death of my said wife, Dortha Swenson, that all my said real estate not heretofore previously disposed of shall thereupon pass to and be vested in fee in my heirs at law, share and share alike." He died in 1891, about two years after the Probate Code of 1889 took effect; his wife surviving. *Held*, that the words "heirs at law," as used in the sixth and seventh paragraphs of the will, meant "next of kin."

Appeal by Christena Catharine Swenson and Hilda Louisa Peterson, from an order of the District Court of Goodhue County, *W. C. Williston*, J., made June 21, 1893, denying their motion for a new trial.

On May 8, 1884, Charles A. Swenson of Roscoe in Goodhue County made his last will. He was over sixty years old, married but childless. His wife, Dortha Swenson, was sixty years old. His father and mother were both dead. He had two sisters, Christena Catharine Swenson and Hilda Louisa Peterson and one brother, Peter John Swenson. Two girls, Mary Swenson and Mary Jennie Johnson, not related to him, had lived in his family for several years, but

neither had been adopted by him. He possessed real and personal property in this state valued at about $50,000. The following is a copy of his will;

## Will.

I, Charles A. Swenson of the town of Roscoe, in the county of Goodhue, and State of Minnesota, being of sound mind and memory, do make, ordain, publish and declare this to be my last will and testament:

*First*, I order and direct that my executors, hereinafter named, pay all my just debts and funeral expenses as soon after my decease as conveniently may be.

*Second*, After the payment of such funeral expenses and debts, I give, devise and bequeath unto my beloved wife, Dortha Swenson, an estate for her own life in and to all the real property of which I may die seized; to hold the same during her natural life, and to apply all the profits and increase arising therefrom to her own support and the support and education of my adopted daughter Mary Swenson (formerly Marit Johnson), until she shall arrive at full legal age. And my will is that in case any surplus of such rents and increase over and above the amount necessary for fully carrying out the purpose aforesaid shall remain in the hands of my said wife it shall be disposed of by her as she may choose.

*Third*, I give and devise to my adopted daughter Mary Swenson (formerly Marit Johnson), the homestead farm of two hundred acres occupied by me in the township of Roscoe in said county, and described as follows, to-wit: The south-west quarter and the south-west quarter of the north-west quarter of section five in township one hundred and nine (109) range sixteen (16) to hold the same subject to the said life estate of my said wife therein.

*Fourth*, I give and devise to Mary Jennie Johnson of Otter Tail county, Minn., the north half of the north east quarter of section seven (7) town one hundred and nine (109) range sixteen (16), in said Goodhue county, subject to the said life estate of my said wife therein.

*Fifth*, I give and bequeath to my beloved wife Dortha Swenson, two thousand dollars in personal property, the same to be selected by her out of any property that I may die possessed of at the valua-

tion the appraisers of my said estate may fix on the same, and should she neglect or refuse to make such selection, then it is my will that my executors shall pay her the said amount of two thousand dollars ($2000) in cash, as soon as the same can be realized out of the proceeds of the personal property.

*Sixth,* I give and bequeath all the rest of my personal property, of every kind whatsoever, including notes, bonds, mortgages and contracts to my heirs at law, share and share alike.

*Seventh,* I will at the death of my said wife, Dortha Swenson, that all of my said real estate not heretofore disposed of, shall thereupon pass to and be vested in fee in my heirs at law, share and share alike.

*Lastly,* I make, constitute and appoint C. Albert Swenson, and Otto Thoreson executors of this my last will and testament, revoking all former wills by me made.

In testimony whereof, I have hereunto subscribed my name and affixed my seal, the 8th day of May in the year of our Lord, one thousand eight hundred and eighty-four.

C. A. SWENSON.    [Seal.]

The testator died November 8, 1891, in said County. His brother died intestate September 21, 1891, leaving several children. 1878 G. S. ch. 47, § 25; Laws 1889, ch. 46, § 42. The will was proved and his estate administered in the Probate Court of Goodhue County. On February 1, 1893, that Court made a decree of distribution and assigned the entire estate to the widow, except the reversion in two farms given by the will to the girls. The sisters appealed to the District Court where the decree was affirmed. They moved for a new trial and being denied appeal.

*Charles C. Willson* and *Charles W. Bunn,* for appellants.

The objects of the testator's bounty, the donees of his property, are to be determined by the sense in which the words in the will were used when it was drawn and authenticated in 1884. When he made his will and selected those words to designate the persons to whom he intended to give his estate, his sisters and his brother were at common law and by the statute his heirs presumptive. 1878 G. S. ch. 46, § 3. Before his death the Legislature enacted the

Probate Code, § 64. By it, the surviving wife, as widow, but not strictly speaking as her husband's heir, is given the estate of a childless husband, if it be not otherwise disposed of by his will. When Charles A. Swenson made his will he did not intend to designate his wife by the terms, "my heirs at law, share and share alike," as she was not, by the law then in force, entitled to the estate had he died intestate. He has not since altered the will to express any new purpose and the old publication and authentication of the will still stand to verify it. It cannot be said that he has made a new will to carry out a new purpose formed after this will was made. It is claimed that he has formed such new purpose to give the residuary estate to his wife, instead of to his brother and sisters, and that the old will without any new publication has become a new and different one, having an effect different from that it had when it was executed. If by legislation or subsequent usage words in a will come to have a new or different meaning or signification from that which they had when they were chosen and used in the will when drawn and executed, the will should be construed after the testator's death in the sense which the words bore when the will was made and the words were selected to express his purpose.

Jarman says, Vol. 1, ch. 10, with regard to wills that whenever the testator refers to an actually existing state of things, his language is referential to the date of the will and not to his death, and illustrates as follows; (1 Jarm. Wills, 5th Am. Ed. 323.) If a testator give an estate or a sum of money to his son John, the gift will take effect in favor of his son of this name, if any, at the date of the will, and of him only. If, therefore, such son should die in the testator's lifetime, and he should afterwards have another son of the same name who should survive him, such after-born son would not be an object of the gift.

S. Richards made his will September 12, 1821, by which he said; "I give my wife all my mortgages, bonds, etc." She afterwards died and he married another woman, and after that died in August, 1824. The second wife claimed that the will spoke as of the testator's death, and claimed the mortgages, bonds, etc. Sir John Leach, Master of the Rolls, held the widow was not entitled. *Garratt* v. *Niblock*, 1 Russ. & Mylne, 629.

A testator, by a codicil, bequeathed to certain of his servants, naming them, £500 each, and then added "to the other servants £500 each." Sir Lancelot Shadwell, Vice Chancellor, held that Ann Relfe, who was a servant when the codicil was executed, was entitled to £500, although she subsequently quit the service in testator's lifetime and did not return to it and was not a servant when he died. *Parker* v. *Marchant,* 1 You. & Coll. 290.

Cases having no application are sometimes cited as supporting the doctrine that a will speaks as of the date of the death of the testator, rather than as of the date of the drafting of the will, when in fact the cases are upon the question whether the donees are those at the testator's death or at a subsequent time, as at the end of the life estate of the first donee. Such are the following; *Abbott* v. *Bradstreet,* 3 Allen, 587; *Kellett* v. *Shepard,* 139 Ill. 433; *Lincoln* v. *Perry,* 149 Mass. 368; *Wood's Appeal,* 18 Pa. St. 478.

A change in the law does not change the meaning of the words used by a testator. It may change the legal effect of a devise, and so change the legal operation of a will, but not because it changes the testator's meaning. *Hasluck* v. *Pedley,* 19 Eq. Cas. 271.

It has been repeatedly held in England that when the inquiry is to determine what the testator intended by the use of certain words or expressions, the old and ordinary rule applies that the will speaks as of its date. And further that this meaning prevails even where by subsequent changes of statute the words would have had a different meaning if used in a will executed after the new law. *In re March, Mander* v. *Harris,* 27 Ch. Div. 166; *Jones* v. *Ogle,* 8 Ch. App. 192; 1 Jarm. Wills, 6th Am. Ed. 332, note.

The testator's intention governs as much with respect to construing the word "*heir*" as to any other word in a will. And that word has, in a multitude of cases, been given such meaning as conformed to the testator's intentions gathered from the context and the whole will. It has been construed to mean children, next of kin, heirs of a particular class or description, heirs presumptive, heirs apparent, heirs at the date of the will, heirs at the testator's death, or heirs at a later date, according to the sense in which the testator intended to use that word. 2 Jarman, *905 to *934. The following cases are precisely in point in this case. *Watkins* v. *Ordway,* 59 N.

H. 378; *Richardson* v. *Martin*, 55 N. H. 45; *Lord* v. *Bourne*, 63 Me. 368; *Rusing* v. *Rusing*, 25 Ind. 64; *Bailey* v. *Bailey*, 25 Mich. 185; *Quick* v. *Quick*, 21 N. J. Eq. 13.

*S. J. Nelson*, for respondent.

It is a settled rule of law that a will does not take effect until the death of the testator, and those only are the heirs at law of the testator who are so declared by the law then in force. He is an heir at law upon whom the law casts his ancestor's estate immediately on the death of the ancestor. Where the language employed in the will is clear, and of well defined force and meaning, extrinsic evidence of what was intended, cannot be adduced to qualify, explain, enlarge or contradict this language, but the will must stand as it was written. In order to reach the construction which they place upon the words "*my heirs at law*" the appellants are compelled to travel outside of the instrument, and indulge in suppositions which they claim the testator had in mind when he wrote the will. *Lavery* v. *Egan*, 143 Mass. 389.

Wherever, by law, the wife may succeed to the estate of her husband in the same manner as an heir, to that extent she is an heir of her husband. As the wife does not come into the full possession or enjoyment of her one third interest in her husband's estate until the husband's death, in that respect she takes this one third interest as an heir of her husband. *Dayton* v. *Corser*, 51 Minn. 406; *Holmes* v. *Holmes*, 54 Minn. 352; *Glass* v. *Davis*, 118 Ind. 593; *Rawson* v. *Rawson*, 52 Ill. 62; *Alexander* v. *Northwestern M. A. Ass'n*, 126 Ill. 558; *Glass* v. *Davis*, 118 Ind. 593; *Eastham* v. *Barrett*, 152 Mass. 56.

The testator gives his wife a life estate in his real estate and $2,000 of his personal property and disposes of the remainder to his heirs at law. In disposing of the remainder to "*my heirs at law, share and share alike*," the testator meant to give it to such person or persons as would answer that designation at his death. As the testator's wife, according to the law of this State, comes within the terms, "my heirs at law," she is entitled to take such remainder, for there is nothing in the context of the will to indicate any other than the legal definition of the words, "my heirs at law," and as she is the sole heir at law she is entitled to the whole estate. *Bul-*

*lock* v. *Downs,* 9 H. L. Cas. 1; *Alexander* v. *Northwestern M. A. Ass'n,* 126 Ill. 558; *Kellett* v. *Shepard,* 139 Ill. 433; *Richards* v. *Miller,* 62 Ill. 417; *Rawson* v. *Rawson,* 52 Ill. 62; *Abbott* v. *Bradstreet,* 3 Allen, 587.

As long as a person is living no one can be identified under the expression, "my heirs at law," and so the law gives those words a certain definition, and one who makes use of such words without giving them a clearly different definition is held to the legal definition, and parol evidence is not to be introduced to vary this definition. The testator knew that the Legislature might change the law of descent by changing the order in which persons may inherit, or in any other respect. He is presumed to have known before his death, as a matter of law, that the Legislature of this State did in 1889 change the law of descent, and that the law went into effect October 1st of that year. He knew that by that new law his wife was preferred as his heir at law over his brother, sisters or any other of his kin. If he had his brother and sisters in mind, calling them "my heirs at law" when he wrote his will, and know of the change of the law of descent for more than two years before his decease, and did not change his will, it may well be taken as proof that he had undergone a change of intention and was satisfied that his wife should take his property. He did not in his will provide against the change of the law of descent, and therefore, he took his chances in this respect. *Lincoln* v. *Perry,* 149 Mass. 368.

As to the question, who comes within the terms, "*my heirs at law, share and share alike,*" the will speaks from the death of the testator. The expression "share and share alike" does not change the legal definition of the word heir.

COLLINS, J. The last will and testament of Charles A. Swenson, a resident of this state, was made May 8, 1884. He was a married man, childless, and the ages of his wife and himself were such that it could not be expected that children would be born to them. His father and mother were both dead. He had two sisters, these appellants, and a brother, the latter dying in September, 1891. Swenson died November 8, 1891, leaving real and personal property valued at about $50,000. By the terms of the will Swenson gave and devised to his wife, this respondent, an estate for life in and to all

of the real property of which he died seised, she to apply the profits and increase therefrom to her own support, and to the support and education of Mary Swenson, who was described as an adopted daughter, (but who had not been adopted,) until the latter became of age. Should a surplus remain of such profits and increase over and above the amount necessary for the purpose above specified, the testator directed that it should be disposed of by his wife as she saw fit. To said Mary Swenson he gave and devised his homestead of two hundred acres, subject to the life estate of his said wife; and to one Mary J. Johnson he gave and devised another tract of land, subject to said life estate.

He gave and devised to his said wife $2,000 in personal property, to be selected by her out of his personalty, at the appraised valuation; and, should she neglect to make such selection, his executors were directed to pay her $2,000 in cash. Then followed the following paragraphs:

"Sixth. I give and bequeath all the rest of my personal property of every kind whatsoever, including notes, bonds, mortgages, and contracts, to my heirs at law, share and share alike.

"Seventh. I will, at the death of my said wife, Dortha Swenson, that all my said real estate not heretofore previously disposed of shall thereupon pass to and be vested in fee in my heirs at law, share and share alike."

At the time this will was drawn, and for some years afterwards, until October 1, 1889, when the new Probate Code took effect, the brother and sisters of the testator, three in number, were the presumptive heirs at law under the statutes of this state. Had he died intestate during this period, his real estate, less the share which by law must go to the widow, would have descended to these persons, next of kin, in equal shares; or, had one deceased prior to this, his or her share would have descended to lawful issue by right of representation. 1878 G. S. ch. 46, § 3, subd. 5. And had any personal property remained after setting apart certain statutory allowances to the widow and paying claims against the estate, it would have been distributed in the same way. Id. ch. 51, § 1, subd. 6. But by the new Code (Laws 1889, ch. 46) very radical changes were introduced into the laws of this state regulating the descent of real property and the distribution of the personalty of a

husband, or wife dying intestate and without children, and these changes, it is claimed, and it was so held in both Probate and District. Courts, must govern and control the construction which is to be placed on the language used by the testator long before the enactment of the Code. To put it in another form, it is contended that we are obliged to construe the residuary clauses in the light of the new statute, and thereby confer the fee to all of the real property and the absolute title to all of the personal property upon the widow, although she was already provided for in the will; thus totally ignoring those who were heirs at law presumptive when the will was made, and who, confessedly, would have succeeded to the property had the statute remained unchanged. By the terms of subdivision 2 of section 64 of the Code the whole of Mr. Swenson's real property would have descended to his surviving wife had he died intestate subsequent to October 1, 1889, and by the provisions of subdivision 6 of section 70 she would have also succeeded to all of his personal estate. She would have been his heir at law; and, because of this, we are asked to construe the will precisely as if the change had been made in the statute prior to its execution. And to support this position respondents' counsel cites us cases in which it has been held that under a statute similar to our own the survivor may become the sole heir at law, or may be included among other heirs at law, of a deceased husband or wife; and, further, that although made the object of a special devise or bequest in the will, a surviving husband or wife may take as an heir under a residuary clause. But these cases are not exactly in point, for in all probability no controversy would have arisen between those parties had the present Code provisions been in force when Mr. Swenson made his will, in 1884. The doubt over the proper construction of the residuary clauses, and as to who should take under them, arises solely because of the statutory changes; and the cases cited did not arise under such circumstances.

The cardinal rule in the construction of wills, to which all others must bend, is that the intention of the testator expressed in the instrument shall prevail, provided that it be consistent with the rules of law. A court is bound to give that construction which will effectuate the intention, if such intention can be gathered from the terms of the will itself; and the intention is to be gathered from

everything contained within the four corners of the instrument. These are but elementary propositions, familiar to all, and in endeavoring to ascertain the intention a court is authorized to put itself in a position occupied by a testator, in order, in view of the circumstances existing when the will was executed, to discover from that standpoint what he intended by it.

Now, if we are to be governed by the dominant rule of interpretation when construing the residuary clauses in this will, bringing to our aid the environments which existed when the testator executed it in 1884, there would seem to be absolutely nothing in the way of a speedy and satisfactory conclusion. Doubt and difficulty are encountered when we abandon the effort to ascertain and carry out the intention by permitting an act of the legislature to intervene, and totally thwart the testator's plan and purpose, and to deprive his sisters and the sons and daughters of his deceased brother of the bounty which he had provided for them; for it is evident that when using the words, "heirs at law, share and share alike," as he twice did in the will, his mind was fixed upon his brother and sisters then living, and their children, if any. It was undoubtedly his intention to provide for them, first recognizing the claim that his wife had upon him and his estate. He was childless, and these relatives were his heirs presumptive under the law. His wife, should she survive him, he dying intestate, would be entitled to a life estate in their statutory homestead, and to an undivided third in fee of all other real estate. She would also be entitled to certain allowances and her support during a settlement of the estate out of the personalty, and to one-third of the residue. Of a life estate in the homestead, of a third in fee of other real property, and of these allowances and her support pending settlement she could not be deprived by will without her consent. But the one-third share of his personal estate which would have gone to her under the statute, had he died intestate, was his to dispose of by last will and testament, if he chose so to do. While the value of her share of the estate under the provisions of the will has not been made to appear, it is fairly to be inferred that the testamentary provision made for her is of greater value than was absolutely required under the statute. There is no intimation that she was not abundantly provided for.

Returning now to a consideration of the testator's intention as indicated by the surroundings and as expressed in the will, it is obvious that at its execution there were no other persons in existence to whom the words in the residuary clauses would apply. It is equally as plain that the testator contemplated no change in the statute which would involve the absurdity of an ultimate devise of real property in fee to the same person to whom he had given a prior devise for life, or that his wife, to whom he had granted a life estate in all of his lands, should in any way acquire the reversion as an heir at law. If such is to be the result, it is by means of an entire disregard of the testator's intention, and the application of unyielding rules of law. To bring this result about, we must hold that the will speaks and points out the heirs as of the day it took effect, and not as of an earlier day; in other words, that the Code was intended to alter, and in this case has altered, the proper meaning and construction of the words contained in a will drawn years before. The testator intended the reversion to go to three certain persons, designated as clearly as if their names had been written. The statute intervenes, and not a vestige of that intent can be effectuated. The rule that a will speaks as of the date of the decease is not an unyielding one, especially when by a change of statute, the words would have had a different meaning if used in a will executed under the new law. *Quick* v. *Quick*, 21 N. J. Eq. 13; *In re March, Mander* v. *Harris*, 27 Ch. Div. 166; *Jones* v. *Ogle*, 8 Ch. App. 192. Nor is there an inflexible rule for determining the meaning of the words "heirs at law," or any other words found in a will. From an examination of the authorities it will be found that these particular words have been construed to mean children, adopted children, next of kin, heirs of a particular class or description, heirs presumptive, heirs apparent, heirs at the date of the will, heirs at the decease of the testator, or heirs at a later date even, the construction seeming to rest and to be predicated upon an ascertainment of the testator's intention from the words used, from the context of the instrument and from the surrounding circumstances. 2 Jarm. Wills, (6th Amer. Ed.) *905 et seq., and notes; Schouler, Wills, §§ 470, 533, 542, and cases cited; *Lord* v. *Bourne*, 63 Me. 368; *Rusing* v. *Rusing*, 25 Ind. 64; *Reinders* v. *Koppelman*, 94 Mo. 338, (7 S. W. 288;) *Howell* v. *Ackerman*, 89 Ky. 22, (11 S. W. 819;) *An-*

*thony* v. *Anthony*, 55 Conn. 256, (11 Atl. 45;) *Bailey* v. *Bailey*, 25 Mich. 185; *In re Sessions' Estate*, 70 Mich. 297, (38 N. W. 249.) See, also, *Greenwood* v. *Murray*, 28 Minn. 120, (9 N. W. 629.)

It is suggested by counsel for respondent that, although the testator may have intended that his brother and sisters should have the reversionary interest in his realty, and should succeed to his personalty upon his decease, less the amount bequeathed to his wife and her statutory allowances, he "took his chances," as it is expressed in some of the cases, when neglecting to provide for future legislation affecting the rules of descent and distribution. We are unable to see how an intent to grant the reversion to certain persons, plainly and clearly expressed, would have to be placed beyond legislative control by any provision in the will. The testator would have no reason to suppose that his manifest intent could or would be affected by legislative enactment, and that if, when he executed the will, certain persons were clearly intended and sufficiently designated as the recipients of his bounty, future legislation could interfere with or control that intention and designation. The words "heirs at law," found in the residuary clauses of the will, must be construed as of the date of its execution, and not with reference to the statute as it existed when the testator died.

The order appealed from is reversed, and the case remanded for proceedings in the court below in accordance with the views herein expressed.

(Opinion published 56 N. W. Rep. 1115.)